IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 25, 2003

## STATE OF TENNESSEE v. MAURICE WHITLOCK

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 237553     Stephen M. Bevil, Judge**

---

**No. E2002-01388-CCA-R3-CD**
**April 29, 2003**

---

Pursuant to a plea agreement, the Defendant pled guilty to aggravated assault, a Class C felony and received a three-year sentence with the manner of service to be determined by the trial court. Following a sentencing hearing, the trial court ordered that the Defendant serve his three-year sentence in the Tennessee Department of Correction. The Defendant now appeals, arguing that the trial court erred by failing to grant the Defendant probation or alternative sentencing. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Ardena J. Garth, District Public Defender, and Donna Robinson Miller, Assistant District Public Defender (on appeal); and Myrlene Marsa, Assistant District Public Defender (at trial), Chattanooga, Tennessee, for the appellant, Maurice Whitlock.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; William H. Cox, III, District Attorney General; and Christopher D. Poole, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. FACTUAL BACKGROUND

The following evidence was presented at the Defendant's sentencing hearing. Anita Faye Bivens, the victim in this case, testified as follows:

> It was . . . late one night and my nephew and them was outside playing and I had told them I was laying down on my couch. And I had told them I was going to leave the door unlocked so they can get in and out. So someone had knocked on my door and I was laying down and I said, "Who is it?" But I couldn't really hear who

it was, so I thought it was one of them, so I just told them to come on in. And when [the Defendant] came in, he asked for my cousin. I told him my cousin wasn't there.

And he locked my door. As he came in, he locked my door back. And I was on the phone with my sister at the time and he reached in his back and pulled out this big old gun and he said, "Bitch, give me the money and the dope."

And I'm like, "What is you talking about?"

And he was like, "Get off the phone."

Because at that time I'm telling my sister, I'm like, "There's a man in here with a gun."

. . . .

And he was like, "Hang the phone up."

And I started telling her and at that time he done snatched the phone out of my hand and throwed [sic] it down on the table and hung it up. So I'm sitting there, I'm hysterical because he all in my face and everything. And at the time, my son was in the house, but he was back there on his computer and he didn't hear me screaming and hollering.

So the people next door, they heard me, and they came out and was standing by my window listening to everything he was saying to me and he was asking me was I willing to die for some money.

And I'm like, "What money? I don't have no money."

And he said that he was going to kill me and all that. And like I asked him to leave my house and he wouldn't and then all of a sudden I start getting real scared and start . . . hyperventilating and everything and he kind of got scared and he left. He left my house.

Bivens further testified that the Defendant had a "big old" handgun that he pointed at her while he was in her home. She stated that she did not owe the Defendant any money and that she had never seen the Defendant prior to this offense. Bivens testified that she did not "have anything to do with dope or dealing dope." She reported that the Defendant's actions caused her to have a "nervous condition" which made her "scared of anything."

On cross-examination, Bivens testified that when the Defendant entered her home, he asked for her cousin, Edward Chubb. She stated that the Defendant asked for Chubb by his nickname, "Gully." Bivens did not recall the Defendant stating an amount of money that he was seeking. She explained that although the Defendant did not physically injure her, he "had the gun in [her] face." Bivens stated that as the Defendant left her home, he stated, "Don't cry, I didn't mean to do this." Bivens stated that her cousin sometimes visited her and that on the day of the offense, he had left his car at her house while he went fishing.

The Defendant testified that he was twenty-eight years old. He stated that he was born in Chattanooga, Tennessee, that he moved to Atlanta, Georgia when he was twelve years old, and that he recently moved back to Tennessee. The Defendant testified that when he was younger, he attended special education classes because he had a learning disability. He stated that although he

"can" work, he has had difficulty keeping jobs because he "[c]ouldn't understand certain stuff," and it was hard for him to follow directions. The Defendant reported that just prior to his arrest, he had obtained his first apartment. He explained that he receives disability payments and that he was able to get the apartment "[t]hrough Social Security." He reported that his family had been paying for his apartment since he has been incarcerated. The Defendant testified that his mother and his siblings, a brother and a sister, help take care of him.

The Defendant testified that he went to Bivens' home "[b]ecause Gully had beat [him] out of some money." He stated that Gully had "sold [him] some bad drugs." The Defendant admitted that it was wrong for him to go to Bivens' home. He stated that he took a gun to Bivens's home because Gully had drawn a gun on him in the past. The Defendant maintained that he was afraid of Gully because he was "a big shot in the neighborhood." He claimed that when he realized that Bivens was upset, he apologized, told her not to cry, and left her home.

The Defendant testified that when the police arrested him, he cooperated and explained what had transpired in Bivens's home. He stated that he told police that he "felt bad about what happened." The Defendant maintained that he did not intend to frighten Bivens. The Defendant testified that he gave the police the gun that he used to threaten Ms. Bivens.

The Defendant acknowledged that he had prior convictions for driving under the influence and driving on a revoked license in Hamilton County. He also acknowledged that he had prior offenses for assault and possession of cocaine in Atlanta, Georgia. The Defendant stated that there was a pending charge against him in Atlanta for simple battery. The Defendant maintained that if he was placed on probation, he would comply with any conditions ordered by the court and that he would be able to perform public service work.

On cross-examination, the Defendant acknowledged that he was originally placed on bond in this case, but testified that he was arrested for failing to appear in court. He stated that in 1992, he received three years' probation for a cocaine charge in Atlanta. He also stated that in 1995, while still on probation, he was convicted for possession of a firearm. The Defendant testified that he did not know Bivens prior to this offense and that Bivens did not owe him any money or "wrong him in any way." He maintained that he did not point the gun at Bivens. The Defendant acknowledged that at the time of the sentencing hearing, a charge was pending against him in Georgia for simple battery.

Upon questioning by the trial court, the Defendant testified that he knew at the time of the offense he was violating the law by entering Bivens's home with a gun. He stated that he was "just trying to get [his] money back." He admitted that he should not have been "dealing in drugs" but "that he did it anyway."

## II. ANALYSIS

The Defendant argues that the trial court erred by ordering that he serve his entire sentence incarcerated. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996). Because the record in this case indicates that the trial court adequately considered the enhancement and mitigating factors as well as the underlying facts, our review is de novo with a presumption of correctness.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

The trial court in this case applied the following two enhancement factors: (1) "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," Tenn. Code Ann. § 40-35-114(1); and (2) "[t]he defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community." Id. § 40-35-114(8). The trial court stated that it applied the following mitigating factors that were submitted in the sentencing memorandum: (1) the Defendant

spent almost three years in custody for this charge, (2) the Defendant has family support, (3) the Defendant is a slow learner and has difficulty understanding instructions, (4) the Defendant has a young daughter, and (5) the Defendant has potential for rehabilitation. See id. § 40-35-113(13). However, the trial court found that "the enhancement factors, due to their nature, outweigh" the mitigating factors. The weight given to each enhancement or mitigating factor is within the discretion of the trial court, provided that the trial court has complied with the purposes and principles of the Sentencing Act and provided that its findings are supported by the record. State v. Zonge, 973 S.W.2d 250, 259 (Tenn. Crim. App. 1997).

The Defendant contends that the trial court erred by failing to apply the following mitigating factors: (1) that the Defendant had made efforts to rehabilitate himself; (2) that the Defendant immediately accepted responsibility for his actions and cooperated with police; (3) that the Defendant was remorseful for having placed the victim in fear; (4) that the Defendant had a learning disability; and (5) the Defendant's family background. However, we conclude that the trial court did not err by failing to apply these factors. There is no evidence in the record that the Defendant tried to rehabilitate himself. On the contrary, he was repeatedly given opportunities to improve himself, but he failed to do so. Although the Defendant did admit his responsibility for his actions, we note that he did not do so until he was arrested. The trial court specifically found that the Defendant was more remorseful about the fact that Ms. Bivens was in the home than the fact that he committed a crime. Regarding the Defendant's learning disability, the trial court stated that the Defendant was able to understand his actions and that he purposefully went into Bivens's home with a gun. Finally, we conclude that although the Defendant's father was no longer living with the rest of his family, the Defendant did not allege how this affected his decisions or behavior.

The Defendant next argues that the trial court erred by failing to grant him alternative sentencing. Tennessee Code Annotated § 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration . . . .

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Furthermore, unless sufficient evidence rebuts the presumption, "[t]he trial court must presume that a defendant sentenced to eight years or less and not an offender for whom incarceration is a priority is subject to alternative sentencing and that a sentence other than incarceration would result in successful rehabilitation . . . ." State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993); see also Tenn. Code Ann. § 40-35-303(a).

However, all offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing Moss, 727 S.W.2d at 235). Even if a defendant

is presumed to be a favorable candidate for alternative sentencing under Tennessee Code Annotated § 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider Tennessee Code Annotated § 40-35-103(5), which states, in pertinent part, "The potential or lack of potential for the rehabilitation or treatment of a defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5); see also State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). A court may also consider the mitigating and enhancing factors set forth in Tennessee Code Annotated §§ 40-35-113 and 114 as they are relevant to the § 40-35-103 considerations. Tenn. Code Ann. § 40-35-210(b)(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996).

We conclude that the Defendant is ineligible for community corrections. An offender who is guilty of a "crime[] against the person" is not eligible for a community corrections sentence. See Tenn. Code Ann. § 40-36-106(a)(2). In addition, the Defendant is ineligible for a community corrections sentence because he was convicted of a violent offense, see id. §40-36-106(a)(3), and because he was convicted of an offense in which the use or possession of a weapon was involved. See id. §40-36-106(a)(4).

The Defendant also argues that he should have been granted probation. With certain exceptions, a defendant is eligible for probation if the sentence actually imposed is eight years or less. Tenn. Code Ann. § 40-35-303(a). "Although probation 'must be automatically considered as a sentencing option for eligible defendants, the defendant is not automatically entitled to probation as a matter of law.'" State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997) (citing Tenn. Code Ann. § 40-35-303(b) sentencing comm'n cmts). In determining whether to grant or deny probation, the trial court may consider the circumstances of the offense; the defendant's criminal record, background and social history; the defendant's physical and mental health; the deterrent effect on other criminal activity; and the likelihood that probation is in the best interests of both the public and the defendant. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The Defendant has the burden of establishing suitability for probation. Tenn. Code Ann. § 40-35-303(b); Ashby, 823 S.W.2d at 169.

The trial court found that the Defendant "is a threat to society because he . . . was convicted of assault, he was placed on probation, he committed a crime while he was out on assault, involving a handgun, which is a very serious matter, and after that was over and he had been convicted in this particular case, he does the same thing again: He goes into the house, Ms. Bivens is there, with a handgun." The court stated that the Defendant "went in [Bivens' home] with a handgun and he didn't go in with a handgun by accident, it was deliberate and purposeful, even after he had been

convicted of carrying a handgun." The trial court noted that regardless of the Defendant's learning disability, such dangerous behavior cannot be tolerated.

The trial court stated that although the Defendant may have been remorseful that Bivens was in the home, he did not show any remorse for carrying a handgun into the home in an effort to get his money back. According to the court, the Defendant's "only remorse" was that "it happened to be Ms. Bivens there instead of Mr. Gully." Thus, the court stated that the Defendant was "really not remorseful for committing a crime, but only for the fact that [Bivens] happened to be there." The trial court found that confinement was necessary to protect society, that confinement was necessary to avoid depreciating the seriousness of the offense, and that measures less restrictive than confinement had been unsuccessfully applied in the past. See id. § 40-35-103(1)(A)-(C). We conclude from our review of the record that each of these findings is amply supported by the evidence. We therefore conclude that the trial court did not err by failing to grant the Defendant probation.

Accordingly, the judgment of the trial court is AFFIRMED.

 

 

_____
ROBERT W. WEDEMEYER, JUDGE